J-A22009-23
J-A22010-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF M.J., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.J., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 556 WDA 2023 |

Appeal from the Order Entered April 10, 2023
In the Court of Common Pleas of Armstrong County Orphans' Court at
No(s): 002-ADOPT-2023

| | | |
|---|---|---|
| IN RE: ADOPTION OF M.J., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: R.G., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 576 WDA 2023 |

Appeal from the Order Entered April 10, 2023
In the Court of Common Pleas of Armstrong County Orphans' Court at
No(s): 002-ADOPT-2023

BEFORE:  BOWES, J., OLSON, J., and KING, J.

MEMORANDUM BY BOWES, J.:              **FILED: December 12, 2023**

A.J. ("Father") appeals from the April 10, 2023 order that involuntarily

terminated his parental rights to his biological son, M.J., born in January 2021.

Separately, R.G. ("Mother") has appealed the same order that simultaneously terminated her parental rights to M.J.[1] We affirm.

We gather the relevant factual and procedural history of this matter from the certified record. Mother and Father ("Parents") cohabitate and are married. Armstrong County Children & Youth Services ("CYS") first became involved with this family immediately after M.J. was born addicted to methamphetamines. *See* N.T., 3/28/23, at 9. Mother admitted to abusing methamphetamines and overdosing on heroin during her pregnancy with M.J. *Id*. at 11-12. On January 7, 2021, CYS was granted temporary protective custody of M.J., until he was returned to the legal and physical custody of Father on February 5, 2021. Thereafter, CYS provided in-home services until court supervision was terminated in July 2021.

On July 1, 2022, officers of the Ford City Police Department and the Armstrong County Sheriff's Department attempted to execute a warrant for Mother's arrest at Parents' home on unrelated criminal charges and discovered Parents' home to be in a "deplorable condition." Order of Adjudication and Disposition, 8/1/22, at ¶ 1(3)-(4). M.J. was removed to a temporary kinship placement until July 7, 2022, when Parents' home had been cleaned and he was returned to Father's custody. *See* N.T., 3/28/23, at 11. At this point in time, Mother was alleged to be residing in Chicago, Illinois and Father began

---

[1] As both appeals stem from the same order, we consolidated these cases for disposition pursuant to Pa.R.A.P. 513.

- 2 -

to demonstrate a "lack of cooperation" with CYS. Order of Adjudication and Disposition, 8/1/22, at ¶ 1(9)-(10).

On August 1, 2022, M.J. was adjudicated dependent. *See* Order of Disposition, 9/8/22, at ¶ 1(14). Two weeks later, CYS filed an application for protective custody of M.J. after learning that he had been living apart from Parents with another family member for several days due to the deplorable conditions of the family residence. The agency could not locate Mother and Father.

The court awarded CYS custody of M.J. that same day and confirmed its holding at a shelter care hearing on August 19, 2022. Upon re-establishing contact with CYS shortly thereafter, Mother tested positive for the opioid suboxone, for which she did not have a prescription, and Father confessed to using cocaine. *See* Order of Disposition, 9/8/22, at ¶ 1(15)-(16); *see also* N.T., 3/28/23, at 17-18. Beginning in August 2022, M.J. was placed in a pre-adoptive kinship foster home with B.G. and C.G. ("Foster Parents"), where he has remained. *See* N.T., 3/28/23, at 7, 36-37.

In connection with these proceedings, Mother and Father were each assigned several permanency goals, namely to: (1) undergo a drug and alcohol assessment and follow-up on recommended treatment; (2) submit to a mental health assessment and follow-through on recommended treatment; (3) obtain and maintain suitable housing; (4) comply with random drug

screens; and (5) cooperate with CYS and related services. *See* Permanency Review Order, 12/6/22, at 1; *see also* N.T., 3/28/23, at 18-19, 22-23.

Between August 2022 and February 2023, Parents' respective compliance with these directives was minimal. Additionally, there is no evidence that Parents addressed the underlying substance abuse and mental health problems. *See* N.T., 3/28/23, at 18-28, 66, 71. Both repeatedly refused to submit to random urine screens and, when they did acquiesce to such tests, both tested positive on multiple occasions for various illicit substances including, *inter alia*, methamphetamines. *See* N.T., 3/28/23, at 20-25. Parents also failed to provide access to their home for evaluations performed by CYS and other providers. *Id*. at 25-28, 63-65.

Parents were granted supervised, one-hour visitations with M.J. twice per month. *Id*. at 30. Out of thirteen total joint visits that were offered, Father participated in five, while Mother attended six. *Id*. at 30-31. Accordingly, Parents have enjoyed approximately five to six hours of total contact with M.J. since his removal from their care in August 2022.

On February 23, 2023, CYS filed a consolidated petition seeking to involuntarily terminate Parents' respective parental rights to M.J. pursuant to 23 Pa.C.S. § 2511(a)(5) and (b), at which time M.J. was two years old.[2] The

---

[2] The record is silent concerning the appointment of legal interest counsel for M.J. as contemplated by 23 Pa.C.S. § 2313(a). Paula LaStrape, Esquire, was appointed to serve as M.J.'s guardian *ad litem* and advocate for his best
*(Footnote Continued Next Page)*

orphans' court held a joint termination hearing on March 28, 2023, wherein CYS adduced testimony from the CYS caseworker assigned to this matter, Brenna Irvin, and family resource specialist Brittany Marshall from JusticeWorks Youth Care of Armstrong County ("JusticeWorks"). Mother was not present at the hearing, although she was represented by Lisa Peluso, Esquire, who acted as stand-by counsel because Mother's appointed counsel, Kimberly N. Ferringer, Esquire, was unavailable. Father attended the hearing and was also represented by separate counsel. Parents did not testify, nor did they present any evidence on their own behalf. On April 10, 2023, the orphans' court filed a memorandum and order involuntarily terminating Parents' rights to M.J.[3]

---

interests during these proceedings. **See** Order of Court, 2/27/23. Insofar as M.J. was two years old at the time of the proceedings and incapable of articulating a preference with respect to the termination of parental rights, we observe no structural defect in this case. **See In re T.S.**, 192 A.3d 1080, 1092-93 (Pa. 2018) (holding that "if the preferred outcome of a child is incapable of ascertainment because the child is very young and pre-verbal," then § 2313(a) "is satisfied where the court has appointed an attorney-guardian *ad litem* who represents the child's best interests during such proceedings.").

[3] We note that the orphans' court initially filed a decree terminating Parents' rights to M.J. on March 28, 2023. **See** Decree, 3/28/23. However, there is no indication in the certified record that the court provided notice of this filing to the parties. Thereafter, on April 10, 2023, the orphans' court filed the instant order and memorandum, which was served on the parties.

Mother and Father both filed timely notices of appeal to this Court along with concise statements of errors pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). We outline their respective issues thusly.

Mother presents the following issues for our consideration:

1. Whether Mother's due process rights were violated when her attorney at the termination of parental rights hearing represented her even though there was a conflict of interest, namely the attorney represented the father of Mother's other child in a different dependency proceeding, which was disclosed by Mother to the attorney?

2. Whether the court committed an error of law in finding clear and convincing evidence that Mother's conduct met the statutory requirements for termination, despite the following:

   a. Mother attended all of [M.J.'s] medical appointments, except one, during the pendency of the child's placement;

   b. Mother regularly and consistently attended all of her supervised visitation with [M.J.];

   c. Mother admitted herself into a drug rehabilitation program in December 2022 and was sober for a period of time; and

   d. Mother admitted herself into inpatient psychiatric facility;

   all of which were a part of and in compliance with the permanency plan.

Mother's brief at 5-6 (cleaned up).

Concomitantly, Father has framed his appellate issues, as follows:

1. Whether the court abused its discretion in finding clear and convincing evidence that Father would not or could not remedy his housing situation and therefore involuntarily terminated his parental rights under 23 Pa.C.S. § 2511(a)(5) despite

- 6 -

Father showing in the past a willingness and ability to remedy said housing issues?

2. Whether the court abused its discretion in finding clear and convincing evidence that it would be in the best interest of [M.J.] to involuntarily terminate the rights of Father despite the testimonial evidence of a bond between Father and [M.J.]?

Father's brief at 5-6 (cleaned up).

We begin our review by briefly addressing Mother's first claim for relief, which asserts that Attorney Peluso, who represented Mother as stand-by counsel during the termination proceedings, had an alleged conflict of interest that Mother submits should have disqualified Attorney Peluso from participating in the matter. **See** Mother's brief at 13-14 ("[Attorney] Peluso previously represented the [f]ather of Mother's other child in a CYS proceeding. . . . Because of [Attorney] Peluso's past prejudices against Mother due to the prior representation, [Attorney] Peluso could not zealously represent Mother in this case."). Specifically, Mother asserts that she first learned of this alleged conflict of interest prior to the termination hearing during a permanency review proceeding wherein Attorney Peluso also filled in for Mother's appointed counsel. **Id**. at 14. Despite learning of this apparent conflict, neither Mother nor her regular attorney raised any issue with the orphans' court.

Our standard of review concerning matters pertaining to disqualification of counsel on ethical grounds is plenary. **See Rudalavage v. PPL Electric Utilities Corp.**, 268 A.3d 470, 478 (Pa.Super. 2022).

In support of this contention, Mother has invoked Pennsylvania's Rule of Professional Conduct 1.7(a)(2). *Id*. at 13. This Rule provides, in pertinent part, as follows:

> (a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
>
> . . . .
>
>> (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.
>
> (b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:
>
>> (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
>>
>> (2) the representation is not prohibited by law;
>>
>> (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and
>>
>> (4) each affected client gives informed consent.

Rule of Prof. Conduct 1.7(a)-(b). As a general proposition, a court's authority to disqualify counsel based upon the Rules of Professional Conduct is "limited," and may be exercised only when it "is needed to ensure the parties receive the fair trial which due process requires." *Vertical Resources, Inc. v. Bramlett*, 837 A.2d 1193, 1201 (Pa.Super. 2003) (cleaned up).

Instantly, Mother did not file a motion seeking to disqualify Attorney Peluso, nor did she otherwise bring this matter concerning her representation to the orphans' court's attention prior to the taking of an appeal. Rather, Mother raised this claim for the first time in her Rule 1925(a)(2)(i) and (b) concise statement of errors. **See** Concise Statement, 5/5/23, at ¶ 1. It is well-established that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). Furthermore, a party is not permitted to "rectify the failure to preserve an issue" by proffering it in a Rule 1925(b) concise statement, which "is not a vehicle in which issues not previously asserted may be raised for the first time." **Hinkal v. Pardoe**, 133 A.3d 738, 746 (Pa.Super. 2016). This claim is waived.

Moreover, even if we were to charitably overlook Mother's waiver of this issue, there is no documentation or testimony in the certified record speaking to Attorney Peluso's alleged conflict of interest. Rather, the only facts upon which Mother has based this claim were asserted, for the first time, in her brief to this Court. **See** Mother's brief at 13-14.

We remind Mother that "[f]or the purposes of appellate review, what is not of record does not exist." **Frank v. Frank**, 587 A.2d 340, 342 n.5 (Pa.Super. 1991) (citing Pa.R.A.P. 1921). We are only entitled to rely upon facts that appear in the certified record. **See In re J.I.R.**, 808 A.2d 934, 935 (Pa.Super. 2002). We may not consider "unsubstantiated allegations" in reviewing an appeal. **K-B Bldg. Co. v. Sheesley Const., Inc.**, 833 A.2d

1132, 1139 (Pa.Super. 2003). To the extent that Mother has attempted to adduce new evidence and testimony in her brief concerning Attorney Peluso's representation of Mother, we are not permitted to consider such materials. *See Warfield v. Warfield*, 815 A.2d 1073, 1076 n.4 (Pa.Super. 2003) ("[T]he unsubstantiated assertions contained in the parties' briefs do not constitute record evidence."). Lacking any arguable basis or support in the certified record, this claim would also fail on the merits. Based upon the foregoing, no relief is due on Mother's first issue.

We now turn to the remainder of Parents' claims for relief, which challenge the merits of the orphans' court's termination findings. Our standard of review in this context is well-established:

> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the orphans' court's findings of fact and credibility determinations if they are supported by the record. Where the orphans' court's factual findings are supported by the evidence, an appellate court may not disturb the orphans' court's ruling unless it has discerned an error of law or abuse of discretion.
>
> An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.
>
> In considering a petition to terminate parental rights, the orphans' court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her

- 10 -

child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa.Super. 2022) (cleaned up).

The involuntary termination of parental rights is governed by § 2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *Id*. at 830; *see also* 23 Pa.C.S. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under at least one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to § 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). This Court need only agree with the orphans' court's determination as to "any one subsection of § 2511(a), in addition to § 2511(b), in order to affirm the termination of parental rights." *T.S.M.*, *supra* at 267.

In the case *sub judice*, the orphans' court terminated Mother's parental rights pursuant to § 2511(a)(5) and (b). These sections provide, as follows:

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

. . . .

**(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions  described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(5), (b).

In order to satisfy the requirements of § 2511(a)(5), the petitioning party must produce clear and convincing evidence to establish:  (1) the child has been removed from parental care for at least six months; (2) the conditions that lead to the child's removal or placement continue to exist; (3) the parent(s) cannot or will not remedy the conditions which led to removal or placement within a reasonable period of time; (4) the services reasonably available to the parent(s) are unlikely to remedy the conditions which led to removal or placement within a reasonable period of time; and (5) termination

of parental rights would best serve the needs and welfare of the child. *See In re B.C.*, 36 A.3d 601, 607 (Pa.Super. 2012).

If a petitioner establishes adequate grounds for termination pursuant to § 2511(a), we then turn to § 2511(b), which requires that it "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). Our Supreme Court has advised that Pennsylvania courts "should consider the matter from the child's perspective, placing [their] developmental, physical, and emotional needs and welfare above concerns for the parent." *In the Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023). Such a determination "should not be applied mechanically," but "must be made on a case-by-case basis," wherein "the court must determine each child's specific needs." *Id*. at 1106. There is no "exhaustive list" of factors that must be considered. *Id*. at 1113 n.28.

Nonetheless, our Supreme Court **has** mandated that a court's § 2511(b) analysis must include "consideration of the emotional bonds between the parent and child." *T.S.M.*, *supra* at 267. Specifically, the court must determine whether the "trauma" caused by sundering the parent-child bond is "outweighed by the benefit of moving the child toward a permanent home." *Id*. at 253 (cleaned up). The recognized threshold for this finding is that the court must determine whether termination will sever a "necessary and beneficial relationship," such that the child "could suffer extreme emotional consequences." *K.T.*, *supra* at 1110. Our Supreme Court has emphasized,

however, that such consequences must constitute more than mere proof of "an adverse or detrimental impact from severance of the parental bond" in order to preclude termination. *Id*. at 1113.

The analysis mandated by § 2511(b) is not narrow but should include consideration of "intangibles such as love, comfort, security, and stability." *T.S.M.*, *supra* at 267. Indeed, our Supreme Court has affirmed that "the parental bond is but one part of the overall subsection (b) analysis." *K.T.*, *supra* at 1113. Thus, "courts must not only consider the child's bond with the biological parent, but also examine the . . . love, comfort, security, and stability the child might have with the **foster** parent." *K.T.*, *supra* at 1111 (emphasis in original; internal citations and quotation marks omitted). Specifically, Pennsylvania courts should also consider factors that naturally arise due to the particular facts of a case, such as: (1) the child's need for permanency and length of time in foster care; (2) whether the child is in a pre-adoptive home and bonded with foster parents; and (3) whether the foster home meets the child's needs. *Id*. at 1113.

With these overarching legal principles in mind, we turn to Parents' respective arguments concerning the orphans' court's § 2511(a)(5) findings. Mother challenges the orphans' court's findings, arguing that she "was complying with the permanency plan by attending supervised visits, admitting herself to inpatient drug rehabilitation, and her past record of cleaning the home." Mother's brief at 12. Concomitantly, Father argues that the orphans'

court's finding should be overturned since he allegedly addressed the concerns regarding the unclean condition of Parents' home. ***See*** Father's brief at 10 ("The court abused its discretion in finding clear and convincing evidence that the parental rights of Father should be involuntarily terminated despite testimony before the factfinder of Father's ability to meet the conditions related to his housing[.]"). We find no merit in either line of argument.

Preliminarily, we note that there is no dispute that M.J. had been removed from Parents' care for at least six months when CYS filed the termination petition. Thus, the first aspect of § 2511(a)(5) is established.

We now turn to the second statutory prong, which considers whether the conditions that precipitated M.J.'s removal continue to persist. As noted above, Parents have principally focused their respective arguments on their attempts to maintain a clean and safe home, which they have framed as the central issue in this case. ***See*** Father's brief at 10; Mother's brief at 12.

Parents are correct to the extent that they recognize that the filthiness and degradation of their home was one of the underlying reasons for M.J.'s removal. Critically, however, there is no evidence that Parents have advanced any appreciable efforts to address the other, more-serious conditions that also caused M.J. to be removed from their care, *i.e.*, Parents' ongoing substance abuse and mental health issues. The evidence of record indicates those conditions remain unresolved.

Parents' substance abuse issues have persisted throughout CYS's involvement with this family. M.J. was born addicted to methamphetamines and Mother overdosed on heroin at some point during her pregnancy. *See* N.T., 3/28/23, at 9-12. At the time of M.J.'s removal, Mother tested positive for the pharmaceutical opioid suboxone, for which she did not have a prescription, while Father admitted to recently using cocaine. *See* Order of Disposition, 9/8/22, at ¶ 1(15)-(16); *see also* N.T., 3/28/23, at 17-18. At the termination hearing, Ms. Irvin and Ms. Marshall each confirmed that Parents continued to abuse narcotics with impunity following M.J.'s removal. *See* N.T., 3/28/23, at 18-25, 70-77. Between August 2022 and February 2023, Parents' respective urine screens each yielded multiple positive results for methamphetamines and other illegal substances. *Id*. Parents also conceded to additional illegal drug use beyond what was revealed by these test results. *Id*.

At most, the record establishes that Mother "self-reported" attending an unidentified "inpatient rehab facility." *Id*. at 19, 65-66. Ultimately, she "signed herself out after two days" of purported treatment. *Id*. There is no documentation in the certified record corroborating Mother's bald assertions that she sought treatment. Similarly, Ms. Irvin averred that Father promised on multiple occasions that he would undergo a drug and alcohol assessment and enter treatment, but there is no indication that he ever followed through on such pledges in a verifiable fashion. *Id*. at 23.

In sum, there is no evidence in the certified record establishing that either Mother or Father ever underwent their mandated drug and alcohol assessments, or otherwise availed themselves of substance abuse treatment services offered to them. Moreover, the testimonies of Ms. Irvin and Ms. Marshall at the termination hearing similarly reflect that neither Mother nor Father ever completed their mandated mental health assessments. *Id*. at 18-28, 65-66, 70-77. Even assuming, *arguendo*, that Parents have succeeded in maintaining a clean and safe home environment, the most troubling aspects of the conditions that caused M.J.'s removal remain unabated.

Based upon the foregoing, we find that the second aspect of § 2511(a)(5) is also satisfied in this case. Furthermore, the evidence recited above also readily establishes the third prong of § 2511(a)(5), namely, that Parents' well-documented inability to follow-through with assessments, treatment, or sobriety evinces that these conditions will not be remedied within a reasonable period. As detailed above, Parents' serious mental health and substance abuse issues have been an ongoing concern for several years, *i.e.*, the entirety of M.J.'s life. In the approximately seven months between M.J.'s removal and the filing of a termination petition, Parents made no appreciable progress in ameliorating these conditions.

The fourth requirement of § 2511(a)(5) mandates a finding that the services "reasonably available" to Parents are "unlikely to remedy the conditions which led to removal or placement within a reasonable period of

time." ***B.C.***, ***supra*** at 607. In undertaking this assessment, Ms. Irvin detailed the types of support and treatment offered to Parents during the course of CYS's involvement with the family, which began with "in-home services" provided by Holy Family Safecare from January 2021 through July 2021. ***See*** N.T., 3/28/23, at 11-13. Although Ms. Irvin testified that these efforts resulted in M.J. being temporarily restored to Father's custody, any improvement of circumstance was temporary and the underlying conditions in this case again deteriorated to the point of M.J.'s second removal in August 2022. ***Id***. at 13-17. At that time, Parents were unsuccessfully offered visitation services, drug and alcohol management, and support services through JusticeWorks. ***Id***. at 20, 56, 61, 66-67. We gather from Ms. Irvin's testimony that Parents also had additional treatment options available through at least one provider, Family ACTS, but never followed through on availing themselves of such services. ***Id***. at 18-20, 23-25, 44-45.

As the nearly two years' worth of services made available to Parents have had no ascertainable improvement in the serious conditions that caused M.J.'s removal from Parents' custody, the record supports the orphans' court's finding that Parents are unlikely to remedy the conditions within a reasonable period of time. Accordingly, the fourth aspect of § 2511(a)(5) is also satisfied in these cases.

Finally, we must consider whether termination will best serve the needs and welfare of M.J. pursuant to § 2511(a)(5). ***See B.C.***, ***supra*** at 607.

Although this inquiry is similar to the analysis that takes place pursuant to § 2511(b), this Court has identified the fifth element of § 2511(a)(5) as a "'discrete consideration'" as opposed to a "'mere formality.'" *In re Adoption of B.J.R.*, 579 A.2d 906, 908 (Pa.Super. 1990) (quoting *In re P.A.B.*, 570 A.2d 522, 525 (Pa.Super. 1990)).

Instantly, we find that the record speaks definitively that termination of Parents' rights best serves the needs and welfare of M.J. When M.J. was removed from Parents' care in August 2022, the child was nineteen months old and had significant developmental delays. He was unable to walk or talk. *See* N.T., 3/28/23, at 8. Since his removal from Parent's custody and placement with Foster Parents, both Ms. Irvin and Ms. Marshall reported that M.J. has successfully completed physical therapy and is "excelling" at improving his "gross motor skills" and his communication abilities. *Id*. at 8, 71-72. Given M.J.'s dramatic improvement in a mere seven months out of Parents' custody and in Foster Parents' care, we find that termination will best serve his needs and welfare. Based upon the foregoing, we observe no abuse of discretion or error of law in the orphans' court's findings pursuant to § 2511(a)(5). Accordingly, we agree that termination is warranted pursuant to this subsection.

We now turn our review to § 2511(b), under which we will consider whether termination will best serve the developmental, physical, and emotional needs and welfare of M.J. *See* 23 Pa.C.S. § 2511(b). As noted

above, we are mandated to conduct a "bond analysis" as part of this review, to ascertain whether termination of Parent's rights will cause "extreme emotional consequences" for M.J. *K.T.*, *supra* at 1110. Parents' arguments on this point essentially allege that the orphans' court overlooked the existence of a strong parental bond between Parents and M.J. *See* Mother's brief at 14-16; Father's brief at 13-17. We must disagree.

Ms. Irvin reported that M.J.'s interactions with Parents reveal that he has only a "slight" bond with them. *Id*. at 47. Assuming, *arguendo*, that Parents possess some manner of bond with M.J., the testimony at the termination hearing clearly evinces that it is not a "necessary and beneficial relationship," such that the child "could suffer extreme emotional consequences." *K.T.*, *supra* at 1110. Rather, M.J.'s true parental bond is with Foster Parents. As noted above, Ms. Irvin testified that M.J. has a "very good relationship" with Foster Parents and has developmentally blossomed in their care. *See* N.T., 3/28/23, at 36. Indeed, Ms. Marshall testified that M.J. was "excited to leave" the visits with Parents and return to the care of Foster Parents. *Id*. at 74 ("As soon as the foster mom walks in the door when time is up, he is very excited. He runs to her. He would rather be with her[.]"). This testimony indicates that the termination of Parents' parental rights will not cause undue trauma to M.J.

Furthermore, the lack of a parental bond with Parents, coupled with the dramatic improvements to M.J.'s ambulatory and communication skills since

his placement with Foster Parents, evince that termination of Parents' rights will best serve M.J.'s developmental, physical, and emotional needs and welfare. Accordingly, we find no abuse of discretion or error law in the orphans' court's findings pursuant to § 2511(b).

For the foregoing reasons, we affirm the order involuntarily terminating the parental rights of Mother and Father pursuant to 23 Pa.C.S. §§ 2511(a)(5) and 2511(b).

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

12/12/2023